## In re WOODS FARMERS COOPERATIVE ELEVATOR COMPANY, Debtor.

Bankruptcy No. 89–05299.

United States Bankruptcy Court,
D. North Dakota.

Oct. 23, 1989.

See also, Bkrtcy., 107 B.R. 689.

---

Wayne Drewes, Fargo, N.D., Trustee.
Kip M. Kaler, Fargo, N.D., for trustee.

Roger J. Minch, Fargo, N.D., for St. Paul Bank for Co-ops.

Rodney and Marie Thompson, West Fargo, N.D., pro se.

Jay D. Carlson, Fargo, N.D., for James E. Nygard.

John C. Irby, Casselton, N.D., Lowell P. Bottrell, Fargo, N.D., and David L. Johnson, Fargo, N.D., for various grain claimants.

Vicki Aldridge, Fargo, N.D., for USA/CCC.

William Binek, Bismarck, N.D., for North Dakota Public Service Com'n.

Dorothy Anderson, Sheldon, N.D., pro se.

Bruce Carlson, Fargo, N.D., for Farmland Mut. Ins. Co.

Rebecca Theim Benson, Bismarck, N.D., for North Dakota Grain Dealers.

## ORDER

WILLIAM A. HILL, Bankruptcy Judge.

This order addresses a series of motions for administrative expenses filed on August 2, 1989, by entities who had prepetition grain storage facility leases with the Debtor/elevator as lessee and which facilities continued to be used by the Chapter 7 trustee post-petition.

Woods Condominium Association (Condominium) as well as various of its individual members filed a claim in the aggregate sum of $29,750.00 for post-petition rents. Olson Farms filed a claim for $1,260.45 stemming from a 1987 lease to the elevator of eight storage bins. The elevator, a public grain warehouse, filed for relief under Chapter 7 on April 13, 1989. At the time of filing it had 322,000 bushels of corn, 30,000 bushels of soybeans and 184,000 bushels of barley stored at the condominium facility with another 24,000 bushels of barley stored with Olson Farms.

Pursuant to section 557(i) of the Code, this court authorized the trustee to sell all grain held by the Debtor including that on storage with the instant claimants. Consistent with this authorization, all 639,951.-86 bushels of grain held by the elevator were sold including the quantities of corn, soybeans and barley on storage with the condominium and Olson Farms. The condominium facility was emptied by the middle of June 1989 and the Olson Farm was

emptied by June 15, 1989.[1] In all, 322,618 bushels of corn were sold of which 251,300 bushels were owned by grain receipt holders and the remainder owned by the elevator. A total of 34,795 bushels of soybeans were sold of which 23,015 bushels were owned by the grain receipt holders. A total of 242,195 bushels of barley were sold of which 184,000 bushels were owned by receipt holders.[2]

The elevator was a party to pre-petition contracts with the condominium and with Olson Farms for the rental of grain storage facilities consisting of grain bins of varying capacity. When the elevator filed for Chapter 7 relief on April 13, 1989, 536,-000 bushels remained in storage with the condominium and 24,000 bushels remained in storage with Olson Farms despite the failure of the trustee to assume or reject the agreements. On May 19, 1989, the trustee moved the court for authority to sell all grain free and clear of liens. After a court mandated rebidding process, a selling agent was authorized and the agent completed the sale of all elevator-held grain by the end of July 1989. There is nothing in the facts of this case suggesting that the trustee or his selling agent were dilatory in liquidating the grain assets. Indeed, it was the trustee that urged an expeditious sale while it was the condominium association that suggested the grain be held until the physical elevator facility could itself be sold. The court is satisfied from its knowledge of this case that the trustee ably carried out his duties and did not retain grain in any storage facility for a time any longer than absolutely necessary to accomplish an orderly sale. By the same token, the court is satisfied that the condominium facility and the Olson Farm facility were integral to the trustee's efforts as they served as a place for the safe maintenance of the grain until load-out could be accomplished.

Consistent with the section 503(b), a trustee charged with the duty of liquidating grain elevator grain assets may recover from the proceeds the reasonable and necessary costs and expenses attributable to the preservation or disposal of such grain. 11 U.S.C. § 557(h)(1). Most often an administrative claim arises in the context of a Chapter 11 or Chapter 7 case when the debtor-in-possession or the trustee enters into a post-petition arrangement for goods and services necessary to the preservation of the estate. In a Chapter 7 situation, as alluded to in section 557(h)(1), the costs incidental to disposition of assets may also constitute an administrative expense as well. Occasionally it happens that the administrative claim arises not from a post-petition agreement between the trustee and a claimant but rather from a pre-petition agreement between the debtor and claimant which is held over by the trustee post-petition. This is the situation here. The present claimants are not parties with whom the trustee entered into a contract or agreement for services. Rather, they are parties to pre-petition agreements between the elevator and themselves and by happenstance of bankruptcy found themselves forced to provide continuous storage space to the trustee until load-out was accomplished. Although one could spend considerable time discussing whether the agreements were contracts or leases of real property, such a determination is not necessary for it is safe to say that the agreements are one or the other and thus at the time of the bankruptcy filing were either unexpired leases or were executory contracts.

1. The parties have agreed to the value of the respective claims with the only issue remaining whether they ought to be treated as administrative expenses. The condominium claim is apparently calculated upon the rental rate of .0225 cents per bushel per month (.0007397 per bushel per day) for 536,000 bushels held for 75.035 days (the precise date of load out is not in evidence). The Olson Farm claim is based upon a contract rate of .0225 cents per bushel per month (.0007397 cents per bushel per day) for 24,000 bushels held for 71 days (4–13–89 to 6–15–89).

2. In several previous decisions relating to the relative interests of competing claimants of an interest in the grain held by the elevator, this court concluded that holders of receipts in a particular commodity type have a bailor/ownership interest in the entire commodity mass.

Given the fact that the claimants are parties to a hold over by the trustee of a pre-petition agreement, it is helpful to our discussion to consider section 365. Section 365(d) requires a Chapter 7 trustee to assume or reject an executory contract or unexpired lease of real property within sixty days of the order for relief. If nothing is done within this time the contract/lease is deemed rejected. In the context of unexpired leases, the Code as amended in 1984 mandates the continued payment of full rent due under the lease for the sixty-day period even though it is ultimately rejected by default, section 503(b)(1) notwithstanding. 11 U.S.C. § 365(d)(3). This section sets up a statutory presumption that any hold-over of a nonresidential leasehold is a necessary cost of preserving the estate. *See generally, In re Patella,* 102 B.R. 223 (Bankr.N.M.1989); *In re National Oil Co.,* 80 B.R. 525 (Bankr.Colo.1987). The legislative history to section 365(d)(3) discusses the problems sought to be alleviated by the section, to-wit:

> [The second] problem is that during the time the debtor has vacated space but has not yet decided whether to assume or reject the lease, the trustee has stopped making payments due under the lease. These payments include rent due the landlord and common area charges which are paid by all tenants according to the amount of space they lease. In this situation, the landlord is forced to provide current services—the use of its property, utilities, security, and other services— without current payment. No other creditor is put in this position ... The bill would lessen these problems by requiring the trustee to perform all the obligations of the debtor under a lease of nonresidential real property at the time required in the lease. This timely performance requirement will insure that debtor/tenants pay their rent, common area, and other charges on time pending the trustee's assumption or rejection of the lease. 130 Cong.Rec. § 8894–95 (Daily Ed. June 29, 1984).

The problem alluded to exists in hold-over situations whether the hold-over is of a residential or nonresidential leasehold, whether the legal nature of the agreement is a true lease of real property, or some form of contract for storage space. The person or party providing the space is in the same predicament when a trustee holds-over. In situations that do not involve the leasing of nonresidential real property, the result should be the same providing the claimants are able to prove that the space or property held over was necessary to the estate. Long before the enactment of section 365(d)(3) courts recognized that under section 503 a lessor of property held over by the trustee post-petition has an administrative claim measured by the period of actual occupation and use of the premises post-petition to the extent the rental was reasonable and necessary to preserving the estate. *See In re Standard Furniture Co.,* 3 B.R. 527 (Bankr.S.D.Cal. 1980). The actual and necessary expenditures of a trustee for the storage of property are contemplated within the concept of "preservation." Moreover, the cost of preserving the grain assets of a defunct grain warehouse is in the interest of every creditor and every receipt holder. It is a cost inherent in the wise administration of an estate. *See generally, 3 Colliers on Bankruptcy,* ¶ 503.04 (15 Ed.1989). The trustee suggests, on the other hand, that if any administrative expenses are allowed to the claimants they can be allowed only against grain actually owned by the elevator and not by otherwise owned by receipt holders. Section 557(h)(1) makes no such distinction but states that the trustee may recover administrative expenses from the proceeds generally. Even property securing an allowed secured claim may be impressed with the costs of administration if it is shown that such expense was incidental to its preservation or disposal and was beneficial to the secured creditor.

It is illogical to argue that the continued storage of the grain, whether owned by the elevator or receipt holders, was not of benefit to them. The continued storage protected the grain from the elements and other hazards until it could be sold. Such an argument begs a correlative question. What alternative was available to the trust-

ee that would have been consistent with his responsibilities under section 704 and section 557? A trustee is accountable for all property of the estate and with regards to grain storage facilities he has no alternative but to sell all grain held by the facility where the quantity of a particular commodity exceeds 10,000 bushels. In the instant case all commodity types stored with the claimants exceeded 10,000 bushels. The trustee, therefore, could neither abandon nor distribute the grain and it would have been a clear breach of his general duties to have simply removed it from the claimant's facilities prior to a time when it could be competently loaded out for sale. Surely no one suggests the grain should have been dumped on the ground and there kept until sold.

Administrative expenses allowed in the context of a section 557 grain disposition constitute priority claims payable directly out of the grain proceeds and thus, as with other priority statutes must be strictly construed. *See In re Flight Trans Corp. Securities Litigation,* 874 F.2d 576, 581 (8th Cir.1989). In light of this standard the court is nonetheless satisfied that the trustee, by availing himself of the pre-petition storage existing at the claimants facilities existing by virtue of pre-petition agreements between the elevator and the claimants, acted consistent with the Code and his action was of benefit not only to the estate but to the receipt holders as well. The resulting claims represent the reasonable value of such use and occupancy and accordingly the respective claims of Woods Condominium Association (collectively) for $29,750.00 and Olson Farms for $1,260.45 are expenses that were reasonably necessary for the preservation of the grain. Accordingly they are allowed as administrative expenses and may be paid pro rata from the proceeds of the sale of corn, soybeans, and barley.

SO ORDERED.